IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERCIA ) | |
| ) | Case No. 1:20-MJ-210 |
| v. ) | |
| ) | |
| KINNARD ANTHONY TURNER ) | |
| ) | |
| AND ) | |
| ) | |
| KOREY KASCHIEF CORNISH, ) | |
| ) | |
| Defendants. ) | |

### AFFIDAVIT IN SUPPORT OF A
### CRIMINAL COMPLAINT AND ARREST WARRANT

I, Randall M. Mason, being duly sworn, depose and state as follows:

## INTRODUCTION

1.  I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been so employed since August 2018, and a police officer with Arlington County Police Department since July 2007. I am currently assigned to Enforcement Group Twelve, Washington Field Division.

2.  Prior to being a Task Force Officer, I was assigned to the Arlington County Police Department's Organized Crime Section in the Vice/Narcotics Unit starting in November 2014. During my time in law enforcement, I have conducted and participated in numerous investigations of narcotics-related offenses, resulting in the seizure of illegal drugs, weapons, and other evidence. These investigations have led to the arrest and conviction of drug distributors and users in the General District, Juvenile and Domestic Relations, and Circuit Courts of Arlington County, as well as the Eastern District Court of Virginia. Through my training and

experience, I am familiar with the actions, habits, traits, methods, and terminology used by drug traffickers. I have been certified as an expert in the distribution of narcotics in Arlington County General District and Circuit Courts.

3. This affidavit is being submitted in support of a criminal complaint charging KINNARD ANTHONY TURNER ("TURNER") and KOREY KASCHIEF CORNISH ("CORNISH") with conspiracy to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

4. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

5. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government. Along those lines, the Court should note that while there is reference made in this affidavit to consensually recorded telephone conversations, only a sampling of pertinent calls is summarized in the document. This is for illustrative purposes and is by no means an exhaustive list or recitation of the relevant conversations that were recorded.

6. Wherever in this affidavit I discuss information resulting from physical surveillance conducted in this investigation, that information, except where otherwise indicated, does not set forth my own personal observations, but rather that which has been provided directly

or indirectly to me through other law enforcement officers who made such observations. Additionally, unless otherwise noted, wherever your Affiant asserts that a statement was made by an individual, such statement is described in substance herein, and is not intended to be a verbatim recitation of such statement. Furthermore, any statements excerpted from recorded conversations, including those that are quoted, are subject to further revision for clarification and/or accuracy.

7. During the course of this investigation, investigators have used a cooperating source (hereinafter, "CS-1"). For purposes of this affidavit, CS-1 will be referred to in the masculine gender regardless of their true gender. To my knowledge, none of the information provided by the cooperating source has proved to be false, misleading, or inaccurate in any material respect.

8. CS-1 has been a confidential source with DEA since June 2020 in hopes of consideration on pending federal drug trafficking charges. CS-1's criminal history includes felony convictions for possession with the intent to distribute marijuana in 2003 and 2008, and possession with the intent to distribute cocaine in 2012. The information CS-1 provided law enforcement has been proven to be true and accurate. With respect to the instant case, CS-1's information concerning TURNER has been corroborated by other confidential sources, information obtained from various public databases, information obtained during this investigation, and consensual recordings. To my knowledge, none of the information provided by CS-1 has proved to be false, misleading, or inaccurate in any material respect. For these reasons, I consider CS-1 to be reliable.

**Probable Cause**

A. **Background of Investigation**

9. Since late 2019, law enforcement has been investigating CS-1, a cocaine distributor based in California who supplied co-conspirators with large quantities of cocaine. CS-1 was arrested in June 2020 after being charged in the Eastern District of Virginia with drug trafficking offenses, and he agreed to cooperate following the arrest. Law enforcement learned that TURNER was attempting to purchase large quantities of cocaine for further distribution. Under the direction and supervision of law enforcement, CS-1 established contact with TURNER to arrange the purchase of multiple kilograms of cocaine.

B. **Communications Between CS-1 and TURNER**

10. On or about June 30, 2020, CS-1 contacted TURNER via Facetime and recorded the conversation audibly with a second device. The following is part of the recorded conversation between CS-1 and TURNER.

| SPEAKER | WORDS SPOKEN |
|---|---|
| CS-1 | Chris told me to give you a holler. I was just giving you a holler |
| TURNER | Yeah, yeah, yeah. I'm trying to line everything up so we can see what's what. He never could tell me a definite, uh, what the number was. |
| CS-1 | You already know right now it's kinda on the, on the scarce side cuz Covid-19 shutting down the borders. |
| TURNER | Yeah, I know, I know. Like I said, I just wanted to get a so I can see what's going on. |
| CS-1 | I know I had told him 30 but due to all this, like, over there in Richmond, where my guy's at, I usually give it to him for 34 right now. Cuz I got to pay the driver. I got to pay my workers down here to put it together. You feel me? |
| TURNER | Right, right. So you saying 34? |
| CS-1 | Um, I know he gave you a price of 30, but I was telling him that price don't work no more. Because even the border from Mexico to here, it costs more now. |
| TURNER | I get what you're saying. The transportation down. Not many vehicles moving right now. |
| CS-1 | Yeah, whatever is moving is little small ones. They will probably bring me 25, 35 when before I could bring |

4

| | | |
|---|---|---|
| | | fucking 60 and 70 on one trip. You feel me? |
| | TURNER | Right, right. |
| | CS-1 | So, whatever is coming in now is coming in slow. |
| | TURNER | You said what? |
| | CS-1 | Whoever is coming in right now, like my little drivers, they'll come in with little 15s and 18s, like small ones right now. |
| | TURNER | No, no. I get what you're saying. But I'm saying, what number are you saying? What's the definite number? |
| | CS-1 | Yeah. I had told Chris 30 but that was before. Let me see. |
| | TURNER | So I'm saying, what number are you saying now? That's what I'm saying. |
| | CS-1 | Just because I'm a man of my word, at least do the 32.5 cuz that way the expense don't come out of my pocket. You feel me? Like I pay the driver. |
| | TURNER | Right, you saying… |
| | CS-1 | Right here in Cali, I'm selling at 30 all day. |
| | TURNER | Say it again? |
| | CS-1 | Right here in Cali, I'm selling at 30 all day. You feel me? |
| | TURNER | Yeah, yeah. I know. |
| | CS-1 | I'm pretty sure you know the prices |
| | TURNER | But, um, you can't do 32 even? |
| | CS-1 | You killing me. |
| | TURNER | Alright, alright. Look look. It's the first time. We'll do 32.5. But look, this your number right here? |

11. Based on my training, experience, and knowledge of this investigation, during this exchange, TURNER and CS-1 discussed the price per one kilogram of cocaine. TURNER agreed to a price of $32,500 per kilogram after attempting to negotiate a price of $32,000.

12. On July 1, 2020, TURNER and CS-1 spoke again via Facetime and CS-1 recorded the conversation with another device. Below is part of their conversation:

| SPEAKER | WORDS SPOKEN |
|---|---|
| TURNER | All right, like I said, if you wanna stay around there for a few days and you want to bring more, like I said, I'm gonna bring you my 10 cash up front and if you bring more, I'll run through some more. |
| CS-1 | How long will it take you though, if I was to bring you some extras? |
| TURNER | Maybe a day, if that. I'm just saying, that's all I can |

5

| | | |
|---|---|---|
| | | bring you is my cash. I can only speak for myself. |
| | CS-1 | Ok. |
| | TURNER | I've been putting feelers out and one dude, another dude want 9, another dude wants 7. But it's like one of those things, like, they got. You know what I'm saying. It ain't like I can say, yo give me your cash and I'mma go. |
| | CS-1 | I know how that goes. They see yours. Maybe you go with yours and show them yours, maybe they'll cash you out and you come back with it. I already know how it is. |
| | TURNER | That's what I'm saying. |
| | CS-1 | The first time is always like that. They be like, fire, but once they see it. Blowing up. 24/7. |
| | TURNER | Right, right. |

13. Based on my training, experience, and knowledge of this investigation, during this exchange, TURNER told CS-1 that TURNER had money to pay for ten kilograms of cocaine up front ("I'm gonna bring you my 10 cash up front"). TURNER related that he had additional co-conspirators who were interested in buying additional kilograms of cocaine, but they were hesitant until they see the quality of CS-1's cocaine. CS-1 reassured TURNER that the cocaine would be of good quality ("fire"). Based on this conversation and the conversation in Paragraph 10 above, TURNER plans to purchase ten kilograms of cocaine from CS-1 for a total of $325,000. After TURNER's unknown co-conspirators see the quality of the cocaine, TURNER anticipates coming back to CS-1 for additional kilograms of cocaine.

14. On July 2, 2020, TURNER and CS-1 spoke again via Facetime and CS-1 recorded the conversation with another device. Below is part of their conversation:

| SPEAKER | WORDS SPOKEN |
|---|---|
| CS-1 | I'mma let you know by latest Monday, Tuesday, but I will be bringing some extras, but the thing is I don't know how many. First, I gotta talk to my guy in Richmond and see how many he's going to cash me out for. |
| TURNER | Right |
| CS-1 | I know your boy is going to want 10, but whatever is extra I will carry it with me, but just right now, I don't know the total, but I will carry some extras. |

6

| TURNER | Um yeah just let me know so I can have everything ready for ya. |
| --- | --- |
| CS-1 | Yeah, I'll be down there before...before my wheels gets down there because usually I'm there before, couple of days before. |
| TURNER | Okay so when do you think you might be? |
| CS-1 | Let me see, Monday, Tuesday... when I know exactly when my wheels, the Mexican wheels, will arrive here, and then I'll let you know exactly when I put that in and I'm takin off. |
| TURNER | Okay cool cool cool. |
| CS-1 | But, it should be soon. |
| TURNER | Okay. |
| CS-1 | You say you won't take long, right cuz... ehhhh (high pitched sound) |
| TURNER | You say what? |
| CS-1 | And a extra. I'm about to take them so you won't take long? |
| TURNER | Hell no. It be, probably a day, that day if that. That's why like I said, maybe a couple two, three hours. That's what I'm saying basically, I put the line out there already. |
| CS-1 | Okay well I'mma talk to you in person once I see you before, so that way you get a feeling of who I am down there. From there we'll talk numbers, you know, in person is better so that way |
| TURNER | Right. |
| CS-1 | Trust me |
| TURNER | Listen, it's cool |
| CS-1 | You're a direct line, you're not no middle man, so that's all I can say |
| TURNER | Check this out. This what I'm sayin. This is a longevity relationship |
| CS-1 | Psh. Trust me bro yeah like. |
| TURNER | (laughs) |
| CS-1 | Yeah, it's hard to get to me, but once you get to me, you'll see the difference. |
| TURNER | Like I said, you'll be like a savior here. (Laughs) |
| CS-1 | Trust me, in person you'll get a feeling of who I am down there. |
| TURNER | That's cool. |
| CS-1 | I'll give you a heads up by Monday, Tuesday if not those days roughly the next week. I'll give you a heads up, but I will be taking [U/I]? |
| TURNER | Okay |
| CS-1 | Cuz I usually do but I dump 'em to my guy in Richmond |

| | |
|---|---|
| | cuz he's the one more like, he'll cash me out for 25/30 and then if I take 15, he'll get rid of them. |
| TURNER | Right, right, right. |
| CS-1 | Next time, I'll give him less, I'll work it out. |
| TURNER | Naw it's cool, it's cool. Like I said, just let me know exact days or whatever so I can, you know, be ready for you. |
| CS-1 | Yeah, I'll let you know during the next week. |
| TURNER | Okay. |

15. Based on my training, experience, and knowledge of this investigation, during this exchange, TURNER and CS-1 discussed the arrangements for meeting prior to the transaction of kilograms of cocaine. TURNER discussed that this initial purchase would be the onset of an ongoing set of purchases from CS-1 ("This is a longevity relationship"). TURNER further discussed his difficulty in obtaining cocaine based in this area ("you'll be a savior here").

16. On July 2, 2020, TURNER and CS-1 spoke again via Facetime and CS-1 recorded the conversation with another device. Below is part of their conversation:

| SPEAKER | WORDS SPOKEN |
|---|---|
| TURNER | Yo |
| CS-1 | What's good yo? |
| TURNER | Nothin' nothin' nothin'. Nah what I was sayin' was I might do way more that's what I was sayin'. |
| CS-1 | (Laughs) |
| TURNER | Like it might be crazy, but I'll talk to you when you get down here. |
| CS-1 | Yeah, once you get to know me, like, numbers ain't a problem. That's all I can tell you. |
| TURNER | I'm just excited that's it. |
| CS-1 | I'm down there so if me going to Mexico means anything, you already know what's it for. |
| TURNER | Yeah, yeah, yeah. |
| CS-1 | Not a lot of people go down there and come back like this so |
| TURNER | Right, right, right. |
| CS-1 | It means a lot. |
| TURNER | Like I said, I'm looking forward to see you gettin' here, that's it. |
| CS-1 | Yeah, I'm gonna keep you posted as soon as next week and I'll let you know, ummm, when I'll be coming down |

8

| SPEAKER | WORDS SPOKEN |
|---|---|
| TURNER | Okay |
| CS-1 | Just wait on everything to proceed as plan though. |
| TURNER | All right. |

17. Based on my training, experience, and knowledge of this investigation, during this exchange, TURNER and CS-1 confirmed that they would be meeting to conduct the cocaine transaction.

18. On July 9, 2020, TURNER and CS-1 spoke again via Facetime and CS-1 recorded the conversation with another device. Below is part of their conversation:

| SPEAKER | WORDS SPOKEN |
|---|---|
| CS-1 | What up bro? |
| TURNER | What's goin' on? |
| CS-1 | Everythin' good? |
| TURNER | You all right? |
| CS-1 | Yeah, drivin' the city. Eh, I'm waiting for one more, I'll be down there roughly 21 on the 20th/21st. |
| TURNER | 20th or the 21st? |
| CS-1 | 20 or the 21st. I'll be down there. I just gotta do a little quick stop in St. Louis, and then from there I'll take off that way. |
| TURNER | Sheesh Alright. |
| CS-1 | Start getting ready brotha cuz you wanna meet me let's see if you ready. (Laughs) |
| TURNER | Nah I thought it would be sooner that's aight. All right. yeah. Aight. |
| CS-1 | So |
| TURNER | I got it.. I got it. |
| CS-1 | I'll be down there by the 20/21st though. |
| TURNER | Okay |
| CS-1 | What's your numbers lookin like |
| TURNER | I mean look.. I might have to reach back out again cuz [U/I] a way. Told a couple people I say, you know, this week commin' up. Like, I thought you were comin here this weekend so I was sayin Monday.. Tuesday. |
| CS-1 | Yeah. |
| TURNER | I got one dude.. I got 10. Another dude probably doing 15. It was supposed to be like 35/40ish. |
| CS-1 | Alright. Imma have like total like between 96 to 105 around there. |
| TURNER | Geez shit, Aight. Um I actually been waitin' [U/I] shit |

9

| | |
|---|---|
| | when it come in here. |
| CS-1 | Just be ready. |
| TURNER | Huh? |
| CS-1 | I don't think you're ready for this type of muscle. |
| TURNER | (Laughs) Look, we gonna see. We gonna see, aight. It gonna be good. It gonna be good. Everything gonna be good. |
| CS-1 | Sounds good, but I just want to give you the heads up that I'm gonna be down there maybe the 20th/21st long…worst case scenario 21st. |
| TURNER | Aight, cool, cool, cool. Keep me posted when you know it's that date so I can line up, you know, line up and get the hotel and shit like that. |
| CS-1 | Yeah, it's all ready. I'm just waiting for one more, but even though if it don't come in, it still don't mess up my numbers. I think it was 104 right now so if the other one makes it in, probably like a buck 25/buck 30. |
| TURNER | That's what you comin' here with? |
| CS-1 | Yeah, I just gotta do one in St. Louis and then for my guy in Richmond but probably your way I'll be like um 90/95. |
| TURNER | Okay |
| CS-1 | Yeah |
| TURNER | That's good, that's good. Imma start hittin people now and make sure people savin' dates. |
| CS-1 | Alright bro. Sounds like a… |
| TURNER | [U/I] I said that shit gonna be done in a couple hours. I got one between me and two of you. That should be good. |

19. Based on my training, experience, and knowledge of this investigation, during this exchange, TURNER and CS-1 attempted to finalize CS-1 bringing cocaine to TURNER and his co-conspirators. TURNER stated to CS-1 that his co-conspirators will be purchasing multiple kilograms after he purchased his quantity ("I got one dude I got 10. Another dude probably like 15. It was supposed to be like 35-40ish").

C. **Meeting Between CS-1 and TURNER on July 21, 2020 in Arlington, Virginia**

20. On July 21, 2020, under the direction and supervision of law enforcement, CS-1 met with TURNER at a pre-arranged location in Arlington, Virginia, which is located within the

10

Eastern District of Virginia. During this recorded meeting, TURNER and CS-1 discussed the purchase of ten kilograms of cocaine, followed by a possible sale of an additional 25 kilograms of cocaine to an unidentified co-conspirator. CS-1 and TURNER agreed to meet on July 22, 2020 to conduct the exchange of $325,000 for ten kilograms of cocaine, as well as a further purchase by additional co-conspirator(s) following the initial exchange.

D.     **Law enforcement surveillance on July 22, 2020**

21.    On July 22, 2020, law enforcement began surveillance of TURNER in Baltimore, Maryland. During the surveillance, TURNER was observed operating his vehicle, a black BMW Sedan with Maryland registration 1EC-7620 (hereinafter, "BMW"). Surveillance observed TURNER subsequently park the BMW, go into a building, and return shortly thereafter carrying a backpack and duffel bag with handles on the top. TURNER opened the trunk to the BMW and placed the bags inside.

22.    After a short period, TURNER met with an additional vehicle, a Honda sedan with Maryland registration 1DE-4757 (hereinafter, "Honda"). The driver of the Honda, identified as Korey Kaschief CORNISH, threw keys to TURNER and TURNER walked into a building. TURNER returned to the BMW after a very brief period, and threw the keys back to CORNISH. Surveillance followed the BMW and the Honda to the carport area of the Renaissance Harborfront Hotel in Baltimore, Maryland, where both vehicles entered and exited after a brief period.

23.    Surveillance followed TURNER, who drove the BMW, and CORNISH, who drove the Honda, from Baltimore to the pre-arranged meeting location in Arlington, Virginia. While driving from Baltimore to Arlington, TURNER communicated with CS-1 and advised that TURNER would be ready to conduct the transaction.

24. Surveillance observed TURNER exit the BMW, and CORNISH, and an unindicted co-conspirator (hereinafter referred to as "UCC-1") exit the Honda, and walk into the pre-arranged meeting location, a hotel in Arlington (hereinafter, "Hotel"). TURNER, CORNISH, and UCC-1 later exited the Hotel, and walked back out to the parked vehicles. TURNER entered the BMW. CORNISH and UCC-1 entered the Honda. The subjects then drove their respective vehicles from the parking area. TURNER parked the BMW in the area of South 12th and South Fern Street, and then walked back towards the Hotel.

25. Surveillance observed the Honda circle the blocks surrounding the meeting location, and subsequently park in the garage of another hotel, near the Hotel. At the same time, TURNER walked back into the Hotel to meet with CS-1. CS-1 and TURNER met inside of a room at the Hotel while the other individuals waited in the area.

26. After meeting with CS-1, TURNER agreed to retrieve the money and return to purchase five kilograms of cocaine. Surveillance observed TURNER walk from the Hotel and meet with the Honda nearby. CORNISH exited the Honda and talked to TURNER. After a brief period, UCC-1 also exited the Honda and all three subjects talked outside of the Honda. CORNISH reentered the Honda.

27. CORNISH and a female individual, who was also inside of the Honda, parked near another end of the parking lot. CORNISH exited the Honda and was observed carrying a gray and black duffel bag.

28. Surveillance then observed TURNER meet back up with CORNISH and UCC-1, and walk into the Hotel. Once inside the Hotel, CORNISH, UCC-1, and TURNER met and walked towards the elevator. Surveillance was unable to observe them at this point.

29. A few minutes thereafter, TURNER walked into the Hotel room where he met with CS-1, while carrying the gray and black duffel bag that CORNISH had carried into the hotel. CS-1 provided TURNER with five kilograms of cocaine (previously tested by DEA and confirmed to be cocaine). TURNER provided CS-1 with the duffel bag which contained a large amount of money. CS-1 also provided TURNER with seven additional kilograms of cocaine, for which TURNER was supposed to pay CS-1 at a later point. TURNER exited the Hotel room and was detained by law enforcement. A search of the BMW revealed additional empty duffel bags. CORNISH was detained outside of the Hotel.

32. Law enforcement learned that CORNISH had rented a room at the Hotel immediately prior to the meeting between CS-1 and TURNER.

## CONCLUSION

33. Based on the facts outlined above, your affiant respectfully submits there is probable cause to believe that on or about July 22, 2020, within the Eastern District of Virginia and elsewhere, KINNARD ANTHONY TURNER and KOREY KASCHIEF CORNISH unlawfully, knowingly, and intentionally combined, conspired, confederated, and agreed with others, known and unknown, to unlawfully, knowingly, and intentionally possessed with intent to distribute five kilograms or more of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Randall Mason
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to in accordance with Fed. R. Crim. Proc. 4.1 by telephone on July 23, 2020.

_____

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge
Eastern District of Virginia